All right, we'll move to our second case, and that is number 19-10964, Danny Crawford et al. v. ITW Food Equipment Group. And, Ms. Wright, whenever you're ready. Good morning, Your Honor. Thank you. May it please the Court, my name is Elizabeth Wright, and I represent ITW Food Equipment Group, which I will refer to as FEG. We have four grounds for which we seek reversal. We ask that this Court exercise the gatekeeping rule envisioned by the U.S. Supreme Court in Daubert and exclude plaintiffs' experts, because the trial court here, on multiple occasions, failed to exercise that gatekeeping rule. We also ask that this Court apply Florida law on negligent design defects, because, once again, the trial court here abused its discretion, but it failed throughout the case to ever analyze the claim under either of Florida's tests for design defects. After applying Daubert and excluding plaintiffs' expert opinion, or applying Florida law on negligent design defects, either one, we ask that you reverse the judgment below and enter judgment in favor of FEG. Alternatively, we ask that you reverse and remand for a new trial. Because here, in a case involving a product defect and the broad question of whether FEG was a reasonable manufacturer, the Court failed to properly instruct the jury on the state-of-the-art defense as required by a Florida law. The state-of-the-art could not be more applicable to an inquiry as to whether a manufacturer acted reasonably. And finally, we also ask, in the alternative, that this Court follow the U.S. Supreme Court precedent and its own precedent and find that the trial court abused its discretion to FEG's prejudice when it allowed in many OSHA summaries, not reports, printed off the Internet, which had no indicia of trustworthiness, were riddled with hearsay, were not substantially similar, and which FEG had no notice of. This was, in fact, a tragic accident. But that did not mean that the Court could dispense with its role to ensure that only appropriate expert testimony and evidence was presented and that Florida law was actually applied. The errors in this case, the multitude of them, began at the Daubert and summary judgment hearing and persisted throughout the trial and the post-trial motions. And as the Court is well aware, the facts here are simple. Mr. Crawford had nearly 40 years of experience as a butcher using meat saws. And one day, he walked away from his meat saw, leaving it running with the blade exposed. When he returned, he put his arm through the saw, something that he admits he would have disciplined or fired anyone else for doing. In this case involved a meat saw and a blade that was the only type he had ever seen or used. In fact, it was the exact same design as the competitor's that sat right next to it in the meat room. The plaintiff here knew not to leave the saw running with the blade exposed. He knew he could be injured. Well, Ms. Wright, but that's why the jury found him 70% negligent. Correct, Your Honor, but in this particular case, the jury has to first decide whether or not the meat saw was defective. And in fact, the trial court, at page 5 of his post-trial motion, sets forth that to prove a negligence came brought in product liability, the plaintiff must also establish that the product was defective or unreasonably dangerous and then has the added burden of proving specific acts. And here, I'll jump first to that issue of design defect under Florida law, but at page 8 of the court's opinion on the post-trial motions, the court conclusively says that the meat saw was defective and that the defective design caused Mr. Crawford's injury. But here, throughout... Well, that's what the jury found, so why is the district court wrong in saying that? The judge is dealing with post-trial motions following a jury verdict, and the jury has found exactly that, so I'm not sure that that's an error by the district court in a post-trial motion. Your Honor, in this particular case, this case should never have gone to the jury in the first instance, either at summary judgment or following the conclusion of the evidence. And when you read the court's opinion, he clearly says that you have to show defect and you have to show the added burden, but nowhere in his analysis does he ever address the two Florida tests for defect, consumer expectation, which, quite frankly, here, they know they can't meet because Mr. Crawford testified this meat saw did exactly what he expected, or the risk-benefit test. And here, the risk-benefit test, which has six elements, the plaintiff did not even make an attempt to address them under five of the six elements, all of which would favor the meat saw not being defective, and the only element they did address... This is Judge Anderson with a question. I assume that you did not request an instruction to the jury about risk utility or consumer expectation because you raised those points only under sufficiency of the evidence argument. Am I correct? That's correct, Your Honor. Okay, so our issue is whether or not there is sufficient evidence of risk utility, for example, and it seems to me that there is ample such evidence with respect to almost every one of the factors. Your Honor, in our position, there is, in fact, ample evidence that the obviousness of the danger, whether it was obvious, the public knowledge and expectation of the danger was well known. With respect to obviousness, the expert testimony in this case is that clearly, obviously, the danger was obvious, but the risk here was inadvertent activity, inattention because of a busy workplace atmosphere, and that is not obvious. Your Honor, I would respectfully disagree. I do believe that that is obvious, that if you're inattentive, this is going to happen. In fact, in this particular case, there's no evidence that there's ever been any notice to FEG of anyone doing what Mr. Crawford has done. As the court noted, you have 150,000 meat saws out there over 70 years, and no one has ever claimed they walked away leaving a meat saw running with the blade guard completely exposed. In fact, Mr. Crawford himself said the meat saw did exactly what he expected, and Mr. Crawford himself also said it was reasonable for FEG to assume that he would lower the guard when he walked away from it. So if you're going to look at whether or not there is reasonableness here and defect, the evidence in the record is, in fact, to the contrary. What FEG did was reasonable, and what Mr. Crawford did was not. But in order to reach even the question of the reasonableness, and you're correct, they did assess 70% to Mr. Crawford, they still have to find that the product was, in fact, defective. And if you look at all the other cases, you'd have to analyze that under a reasonableness standard. I think if you look at Jennings, for example, the court there quite clearly says, under Florida law, while it may be foreseeable that a child may, in fact, use a lighter, it doesn't mean that you violate any duty of care by not childproofing the lighter if, in fact, you give a warning. The same would be true here, Your Honor, under exactly that 11th Circuit precedent, which is here the knowledge that you could be injured if you leave a meat saw running is open and obvious. It's foreseeable to the user, and, in fact, there's a warning saying, do not use the meat saw and don't leave it with the blade guard exposed and keep your hands away. Ms. Wright, this is Judge Jordan. If you did not request an instruction on risk utility and consumer expectation, why should we be reviewing sufficiency of the evidence to see if there was enough to satisfy standards that the jury was not instructed on? In this particular case, Your Honor, the case should not even have gone to the jury in the first instance. I know, but that's not my question to you. My question is a sufficiency question. And so if you think that there is insufficient evidence under these two tests, but the jury was never instructed on these two tests, why should we be reviewing sufficiency under those standards? Well, I believe, Your Honor, that in order to evaluate reasonableness, you have to implicitly be considering what in the record shows that this was or was not a reasonable design. And in this particular case, all of the evidence in the record shows that, in fact, it was a reasonable design, not an unreasonable design. And I think this plays right into that. Well, I know, but that's a general reasonableness standard. That is much more general than the specific test of risk utility and consumer expectation, one of which, as you say, has a number of factors in it. And it just seems odd to me to be reviewing sufficiency on a standard that the jury wasn't instructed on. It's almost like a theory that was never presented to the jury, and now we're supposed to find out whether or not there was sufficient evidence to support that uninstructed theory. That doesn't make sense to me, at least to me. I think, Your Honor, that also plays directly into our concern over the jury instructions here, and in particular the state-of-the-art instruction, which under Florida statutes, the state-of-the-art is, in fact, a defense due a negligence claim. And here, the court refused to instruct the jury on the state-of-the-art, which, quite frankly, would play into also many of those factors. But here, when the court refused to allow us to tell the jury and to allow them to assess the evidence under a state-of-the-art at the time this saw was manufactured and designed, that was clear error on the part of the trial court. And the only explanation the trial court really gives for that is, well, the evidence came in, even if I didn't instruct the jury on it. Well, here, that does make a difference. No, it doesn't, Ronnie. Because here, the evidence of whether a reasonable manufacturing... This is Judge Anson, and I have two questions about this state-of-the-art. It seems to me that the gist of this state-of-the-art instruction that would have been given is, number one, that the relevant time is the time of manufacture, 2010, not the time of the events or trial, and two, that what the relevant state-of-the-art is. And it seems to me that neither one of those was disputed. It was undisputed. Nobody argued that the relevant time was not 2010, date of manufacture, and nobody argued about what the state-of-the-art was. It was undisputed that blade technology was around at the time and that that was the state-of-the-art. That's what the state-of-the-art was about. So it seems to me we can't think that the instruction, if given, would have changed the result at all. Your Honor, with all due respect, that's not what the record is in this case. In fact, the instruction for just general reasonableness only looks under like circumstances. It does not temporally tell the jury you must look at the time of design and manufacture. And in this case, the technology- Was there a dispute about the relevant time? There was nothing told to the jury about what that means. But the critical thing here is- Did the plaintiff ever argue that the relevant time was at a later date? The plaintiff put in evidence post-2010 as well, but there was a great dispute over the technology available in 2010. In fact, their own expert admitted that there was nothing about his design that was available in 2010 when this saw was manufactured. So I hear you saying, Your Honor, that there was no dispute. It was a hotly disputed issue because all of the evidence in the record was that there was no meat saw in 2010 that had any guard different than the meat saw that we had here. There was no evidence, and in fact, their own expert said that what he needed to design his meat saw was not, in fact, available in 2010. He says that at page 134 of Barnett's testimony. So it's a hotly disputed issue as to what the state of the art was in 2010, although we say there was no other saw available then, and to not instruct the jury that they have to consider in 2010 whether or not the saw materials were available and whether or not any other manufacturer had a saw. And in fact, Barnett also said there's no saw that would have prevented this accident in 2010. The district court at page 38 cited the Star-Rite case, S-T-A, next word, R-I-T-E, for the proposition that a jury can find a product defective notwithstanding the fact that the plaintiff's alternative design has not been adopted by any manufacturer and is not commercially produced at the relevant time. Is that not the Florida law? That is Florida law, but that design still has to meet the Daubert standard, Your Honor. In this particular case, Mr. Barnett's stream of consciousness, and at the time of trial, his design was still a stream of consciousness, does not meet the Daubert standard. And therefore, while that is, in fact, Florida law, the plaintiff still has the burden of proving that. And the other issue that compounded this was the admission of those OSHA summaries, which had no indicia of trustworthiness here. I mean, nobody knows anything about the eight summaries that were put into evidence where you don't know the identity of the inspector, you don't have an examination, and they have multiple layers of hearsay. So the evidence on reasonableness of what a manufacturer is doing is compounded by not getting the jury instruction and allowing evidence to come in of OSHA summaries that FEG had no notice of and that, in fact, didn't even involve FEG meat sauce and were under completely different circumstances. So those two things together compounded all of the other error in this case. But the Daubert issue should not be overlooked because here, Mr. Barnett readily admitted it was a stream of consciousness. He had not tested it for economic feasibility. So under stay right, his alternative design cannot be a substitute for whether there was an appropriate design in 2010. And I think his testimony at 134 is the most clear that it was not available in 2010. And I'd like to reserve the balance of my time. All right, thank you very much. You have it.  Good morning, and may it please the Court. This is John Mills on behalf of Danny and Betty Ann Crawford, the athletes in this case. And I would like to begin with an apology to the Court and to our opposing counsel. In preparing for this oral argument and reviewing our brief again, we came across, I came across a number of citation errors that we had. Our substance is all good, but there were several places where we just cited the wrong page or document number, and I think one of them was called out in the reply brief. I think it should be clear to figure out where everything is, but I am horribly embarrassed that our site checking did not catch that and that we submitted a brief that is below our standards. And so I apologize if it has taken the Court any additional time to get through the record. This is mainly on the Daubert issue, which there wasn't a whole lot of discussion about in oral argument. But everything that we say in the brief is correct, and if there's any trouble with the citations, we would be pleased to file a corrected brief. But again, the substance, we stand by all of the substance. It's all correct. Everything is in the record. Turning to the sufficiency of the evidence issue, one thing that's missing here, and the Court is correct, there was no instruction on either of these tests given, but there was one originally requested, and it was going to be given. And the reason that it wasn't given and the reason that they agreed on the record that it not be given was because we dropped the strict liability claims and we only went to the jury on the negligence claims. So the strict liability test has no relevance to the case anymore. There was no reason to instruct it to the jury, and instead the instructions. Back to Anderson's question, my understanding is that counsel, your opponent, did expressly object when the district court decided not to give that particular instruction. No, sir. Well, there's a different instruction. So the answer to your question is no as to an instruction on the risk utility or consumer expectations test. They withdrew that. They agreed that should not be given. The issue that they objected to was when the court was reading the instructions to the jury, it got to the affirmative defenses, and Judge Adams stopped and had a sidebar and said, wait, we have an affirmative defense in here that only applies to strict liability, and that's the state-of-the-art instruction. And he said, shouldn't we take this out? My mistake. It was the state-of-the-art instruction with respect to which the company did expressly object. Is that not correct? That's correct. They did, and they said, oh, they never proposed one for the negligence. Even though we have negligence claims in all the time, they never proposed one for negligence until on the fly they did when this came up on the fly during the instructions. They said, well, just change it to say in evaluating negligence. And we opposed that because this is a strict liability instruction. It's only for product defect cases, design defect cases. This is no longer a design defect case. This is a negligent defect case. And the case law, the jury instructions, the statutes, it's all very clear. Design defect is one of two strict liability claims. You have design defect and manufacturing defect. Negligent design is an entirely different claim with an entirely different test. But, Judge Anderson, you were very correct in pointing out there is no dispute. There was no dispute as to the state-of-the-art that it had to be at the time of manufacture. That was the issue. We never suggested to the contrary. There's not one piece of technology that anybody suggested, oh, that wasn't possible in 2010. That's the result of some scientific breakthrough that's come through since then or some new material. That's not the issue. The issue, and as my sister was arguing right now, the issue was whether anybody else sold that product, whether it was on the market. And Florida law absolutely, just as you and Judge Adams pointed out, Florida law is very clear that just because no manufacturer makes a product and puts it on the market does not mean that they're immune from negligence or strict liability for that. Indeed, the very purpose of tort law, and Chief Judge Carnes recognized this recently in the cruise line case that we cited, but the purpose of tort law is to encourage changes in behavior. And we don't just say, well, we're not going to have seatbelts because nobody's put them before, or we're not going to have a blade guard because nobody's done that before. And sometimes it does take litigation. When corporations are refusing, here the evidence was they said they just never considered protecting the blade because they just didn't think it was a problem, even though the jury was free to conclude, with or without the OSHA reports, that leaving a blade running, that you don't put a feature in that it stops when you're not attending to it, you're leaving a super dangerous piece of equipment running in full operation with no guard, they never considered protecting against that. And had they considered it, it would have been very easy to do. And that's what Professor Barnett's testimony was, that it's very easy to do this. He did it in three days. They did point out some flaws or some concerns that they had about hygiene and cleaning and tripping, and he addressed all of those concerns also very easily. And those were just disputed issues for the jury. So on the sufficiency of the evidence test, there is not even an argument in their brief as to why we did not meet the test for negligence. Their argument is solely on risk utility and consumer expectations. And this court, in the Jennings v. Fick case, made clear that that's not the proper analysis. It said, yeah, some people think that they're the same and you have to have the risk utility test to prove negligence, but that's wrong. This court said it was wrong. It cited Florida cases that we cite as well that they don't even address, the Moorman case, the Light case, that do not apply those tests to negligent design cases. So both that and the issue with the jury instruction, those would have been issues had we gone to the jury on strict liability, and that's the only thing we went on. But we didn't even go to the jury on that. This was just a negligence case. On the Daubert, you know, I'm just going to say, you know, again, we hear this quote, oh, it was stream of consciousness, which is something he threw together. That was only relevant to show how easy it was. He put a lot of time and work into this. He built a prototype. Every one of the cases that they cite, and they're mostly district judges who disallowed Daubert opinions, not any finding that there was an abuse of discretion to do what Judge Adams did. But in all of those cases, the alternative design was purely theoretical. An expert came in and said, well, you could do this. You could do that. But he'd never tried to do that. And in contrast, Professor Barnett, who is, if you read the record, this is the world's probably top expert on blade guards for mechanical equipment. He's been doing this. He's testified in 600 cases. He's super well qualified. He has a lab. He does this as applied science as his business. And he put it together. And he answered every question that they had. They raised some in deposition. And he kept working on it. And that came in. And there was no objection to that coming in. And he addressed every concern that they had. And it was up to the jury to decide whether his design was something that a reasonable manufacturer who had been concerned about safety would have come up with. And so the jury was within its province, and there's really no issue that's preserved there. And just lastly, on the OSHA summary cases, it doesn't seem like a very serious issue, but one case that Judge Adams relied on in his order at page 7, that's document 56 at page 7, he relied on a Western District of Oklahoma decision, Sundance Energy, Oklahoma. And it is also on OSHA reports. And it addresses and rejects all the same arguments they make in their briefs. And so that's one we didn't delve too deeply into in our brief. But it's one that he relied on, and it certainly is just an example of another district judge reaching the same conclusion on similar facts. And all of these issues, except for which standard applies, all of the issues that we're really talking about here are abuse of discretion standards. And Judge Adams took extensive briefing. There was an evidentiary hearing on the Daubert motion. He heard all the arguments of counsel. He articulated all of the arguments of counsel in his orders. And he explained why he was overruling each objection on each point. And these are just pure discretionary decisions. Could he have ruled the other way on some things? Certainly when there's an aspect of something was not done timely, sure, he would have had discretion. But he found there was no harm. This is about the production of the other saws that have gravity blades. There was no harm. Let me interrupt you for a second with a question. This is Judge Jordan. Aren't the OSHA summaries in a very real way different than the underlying reports? And doesn't that difference matter in terms of admissibility? You're saying that the facts of the accidents in the summary are different from the facts of the accident in this case? No, no, that's not what I'm saying at all. I'm sorry. I'm just saying that shouldn't a court treat a summary of a report different than the report itself for admissibility purposes under the rules of evidence? I think so. Generally, I think that context matters and it matters why you're using it. If we were using this to show that a specific saw that's referenced in there was defective and therefore this one was too, if there was a finding of that, certainly we'd need more than summaries. But we didn't rely on this for any ultimate issue. This is really a minor issue in the case. Their experts said in discovery that, hey, you can't get hurt this way. The only way to get hurt is if you're cutting meat. And so we just wanted to have some real-life examples to show that's not true. There's all kinds of different ways that you can be hurt aside from while you're cutting meat. And they do have good blades for while you're pushing the meat against the blades, there's a great guard. The point here is that they were denying that this is even a problem and that they didn't even need to consider it. And there was no temporal issue to that either. They weren't saying, well, we couldn't do that then. They're saying even today we don't need to because that can't happen. And this is just an example of just common sense. If you leave a blade running, there's all kinds, there's a thousand different ways somebody can be hurt. And these OSHA reports are just summaries that just show, all they show is somebody was injured while they were doing something other than cutting the meat. And that's the only, it's minor relevance, it's not major evidence. Even if it was an abuse of discretion to let it in, it certainly wouldn't rise to the level of harmful error. And it was appropriate. And while they did not have, while we agree there's no evidence that they had actual notice of it, our argument on notice was that they should have. They could have found this stuff, and it was just further demonstrating that they were not a reasonable manufacturer. They were not concerned about whether their product, which they knew would be in the workplace, causes workplace injuries and how they could resolve that. And so we made the argument that not only does this show that it was possible, but this shows that it was unreasonable. They didn't even bother to go out and look to see that there's this significant problem that could be fixed relatively easily. So again, it's, back to your question, if we were relying on these for something of, oh look, this exact thing happened, maybe we'd have to get into more detail, and maybe some of their arguments would have a little bit more force. But the issue here is just, hey, is this something that happens? Do people get cut other than as they're pushing the meat across? And yes, they do. And here's eight examples of where this has happened. Many of them happened, most of them happened, before this was manufactured. A couple happened afterwards. But again, there's no issue here of changes over time and technology. It's just changes in time over what somebody has actually put on the market. And Florida tort law, like most states' tort law, is designed to encourage manufacturers and other people to conform their behavior to reasonable standards. And so this is a litigation that hopefully will result in this company and others taking a second look at this, and instead of pooh-poohing these ideas, considering them and making changes. And that's what tort law is all about. If there are no further questions, the judge exercised his discretion here, and the court should affirm. All right. Thank you very much, Mr. Mills. Ms. Wright. Thank you, Your Honor. This is Elizabeth Wright. I want to address a couple of points made by Mr. Mills. First, he's incorrect that this technology was available in 2010. His own expert said there was nothing about his design that was available when this saw was manufactured in 2010 or designed in the late 1990s. That is a highly disputed issue, and the jury needed to be instructed on to the state of the art. I want to move just briefly to those OSHA summaries he mentioned at the end. They were not being used just for showing whether or not FEG had acted reasonably. In fact, no one testified that it was reasonable for a manufacturer to go peruse OSHA summaries of incidents that didn't even involve their own meat saws. They were being used to show, and, in fact, in closing, they said that, in fact, FEG was on notice that these saws were creating problems. The problem here is, though, we know nothing about these few-line summaries. We know nothing about the investigator, nothing about the underlying incident, other than what's reported on the Internet. These are not full-fledged OSHA summaries. And there is a problem here with hearsay, and there is a problem here with the lack of substantial similarity. These meat saws were not people who were walking away and leaving them running. These were people who were trying to deliberately adjust the blade guard while the meat saw was running. That has nothing to do with what would happen here, and even their alternative design would not have prevented those injuries. Likewise, someone was trying to instruct someone on how to use the meat saw deliberately while it was running and managed to get themselves cut. Again, not at all resembling what happened here. And these summaries were filled with so many levels of hearsay where a manager said a co-worker said something happened. Those are not factual findings. They shouldn't have come in, and they, in fact, were the cornerstone of the plaintiff's closing. Additionally, on the reasonableness issue, what is really interesting is that their own expert, Mr. Barnett, said in his own shop, where he had many, many meat saws, he said, you shut off the machine, you stay there until it stops, and then you leave the machine. This is in every shop that uses a vertical band saw. All saws and all machinery can hurt you, and when it's idling down or when it's running freely, we don't allow you to leave the machine. The saws he talked about are exactly like the saw that was here. Hobart and FEG and the store don't let you leave the machine, but Mr. Crawford happened to do it here. So if you're going to look at reasonableness, you need to look no further than Mr. Barnett's own meat shop, where he said, I don't let my employees do this. But, Ms. Wright, and I know this is at a very high level of generality, but don't manufacturers of all sorts of products look at the matter of human error into figuring out how to design their products? Of course, Your Honor. In this particular case, FEG did just that. In fact, that's what any analysis under a risk-benefit would do. The evidence in the record before this jury was that FEG had never had another claim of someone being injured like this. That's what made those OSHA summaries so damaging, because we had no notice of that. And if you have manufactured hundreds of thousands of saws and no one has ever done what Mr. Crawford did, there's no notion that a reasonable manufacturer would do anything differently. And as I said earlier, the Biro meat saw, our competitor's meat saw, the same size was sitting right next to the Hobart meat saw here. It ran exactly the same way. So if you want to talk about reasonableness and state-of-the-art, that's what's reasonable. The competitor's meat saw looks exactly like ours. There's no evidence whatsoever of another claim against Hobart for this kind of incident. And the plaintiff's expert himself admitted that's how all the meat saws he had ever seen over his 60 years of using woodworking and meat saws looked like. So state-of-the-art and admission of the OSHA summaries were absolutely critical and unfairly prejudicial to FEG here and mandate, at a minimum, a new trial. But I also think that Mr. Barnett's testimony about a design that did not even have its pieces parked, according to him, available in 2010 when this one was sold, was unduly prejudicial, should not have come in. And without that, he has no evidence of reasonableness. All right, Ms. Bright. Thank you. Thank you very much.